In re Interest of Phoenix L.,
a child under 18 years of age.
State of Nebraska, appellee,
v. Sonya L., appellant.

In re Interest of Hunter T. and Jagger L.,
children under 18 years of age.
State of Nebraska, appellee,
v. Sonya L., appellant.

708 N.W.2d 786

Filed January 13, 2006.    Nos. S-05-536, S-05-537.

Dennis R. Keefe, Lancaster County Public Defender, and Matthew G. Graff for appellant.

Gary E. Lacey, Lancaster County Attorney, and Lori Maret for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
## I. NATURE OF CASE
Sonya L. appeals from two orders of the separate juvenile court of Lancaster County. In case No. S-05-537, Sonya appeals

from the juvenile court's order terminating her parental rights to her daughter Hunter T. and her son, Jagger L., pursuant to Neb. Rev. Stat. § 43-292 (Reissue 2004), subsections (2) (neglect), (6) (failure to correct conditions leading to adjudication), and (7) (out-of-home placement). In case No. S-05-536, Sonya appeals from the juvenile court's order adjudicating Sonya's daughter Phoenix L. as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2004) and terminating Sonya's parental rights to Phoenix pursuant to § 43-292(2). The two cases were consolidated on appeal for purposes of oral argument, and we consolidate these cases for purposes of opinion and disposition.

In both cases, Sonya, a mother of non-Indian children, argues that the clear and convincing standard of proof required to terminate parental rights set forth in Neb. Rev. Stat. § 43-279.01(3) (Reissue 2004), to which she is subject, violates equal protection, because the standard of proof is less than that required to terminate the parental rights of parents of Indian children under the Nebraska Indian Child Welfare Act (NICWA), Neb. Rev. Stat. § 43-1501 et seq. (Reissue 2004). Under the NICWA, the standard of proof is beyond a reasonable doubt. In case No. S-05-537, Sonya claims that the juvenile court lacked subject matter jurisdiction to rule on the State's motion to terminate Sonya's parental rights. In case No. S-05-536, Sonya claims that there was insufficient evidence to adjudicate Phoenix. In cases Nos. S-05-536 and S-05-537, Sonya claims that there was insufficient evidence to terminate Sonya's parental rights to Hunter, Jagger, and Phoenix and that the evidence failed to prove termination of those rights was in the best interests of the children. Finding no merit to Sonya's assigned errors, we affirm.

## II. STATEMENT OF FACTS

Sonya is the natural mother of the following three minor, non-Indian children: Hunter, born on March 9, 1999; Jagger, born on October 31, 2001; and Phoenix, born on August 5, 2004. The record reflects that Sonya is also the natural mother of Angel L. On November 20, 1997, Sonya's parental rights to Angel were terminated pursuant to § 43-292(2), (6), and (7). Hunter's father is James T. James relinquished his parental rights to Hunter prior

to March 10, 2005. Jagger's father is Justin C. Justin's parental rights to Jagger were terminated by the juvenile court on January 3, 2005. Justin filed a separate appeal challenging the order terminating his parental rights to Jagger, and that order was affirmed by this court in *In re Interest of Jagger L., ante* p. 828, 708 N.W.2d 802 (2005). The record reflects that Jason G. alleges he is the father of Phoenix. There is no indication in the record as to the status of Jason's purported parental rights to Phoenix. None of the children's fathers are parties to appellate cases Nos. S-05-536 and S-05-537, which are the subject of this opinion.

The proceedings in case No. S-05-537 began on August 15, 2000, when a petition was filed in the juvenile court alleging that Hunter was a child within the meaning of § 43-247(3)(a) by reason of the fault and habits of Sonya. According to the record, Hunter, who at the time was approximately 17 months old, had been left by Sonya unattended or without proper supervision. On that same date, the juvenile court entered an order for temporary custody, removing Hunter from Sonya's custody and placing her in the custody of the Nebraska Department of Health and Human Services (DHHS). Hunter was placed in foster care on August 15. She has remained in foster care during the entirety of these proceedings.

On October 17, 2000, the juvenile court adjudicated Hunter under § 43-247(3)(a). Sonya did not appeal the adjudication order. On January 19, 2001, the juvenile court entered a rehabilitative plan, which, in summary, directed Sonya to obtain a psychological evaluation, participate in a drug and alcohol evaluation, participate and successfully complete a parenting program, and have reasonable visitation with Hunter. The primary permanency objective was reunification. Sonya did not appeal the disposition order establishing the rehabilitative plan. Periodic dispositional hearings were held. In orders filed on July 18, 2001, February 2 and December 27, 2002, and March 20, 2003, the court continued the original plan, with minor changes.

On October 1, 2002, a supplemental petition was filed in the juvenile court concerning Jagger. The supplemental petition alleged that he was a child within the meaning of § 43-247(3)(a) by reason of the fault and habits of Sonya. According to the record, a child protection worker had come to Sonya's apartment to

see Sonya and had heard Jagger crying. Jagger was approximately 11 months old at the time. The worker had knocked on the apartment door for 15 minutes, and although the worker continued to hear Jagger crying, no response was received from anyone in the apartment. The worker called the police, who also knocked on the door for a period of time and also received no response. Thereafter, the police contacted the building manager and gained access to the apartment. Jagger was found alone behind a closed bedroom door, which bedroom the record reflects was filthy. Sonya was located asleep in a separate bedroom, with the door also closed. On October 1, the juvenile court entered an order for temporary custody, removing Jagger from Sonya's custody and placing him in the custody of DHHS. Jagger was placed in foster care on October 1. He has remained in foster care during the entirety of these proceedings.

Jagger was adjudicated on April 4, 2003. Sonya did not appeal the adjudication order. On May 2, the juvenile court entered a rehabilitative plan, which noted that poor progress had been made to alleviate the causes of out-of-home placement. This rehabilitative plan directed Sonya to complete a full psychological evaluation, participate in individual counseling sessions, supply DHHS with the names of all adults in her residence, obtain and maintain employment, maintain suitable housing to provide a safe and secure living environment, and have reasonable monitored visitation with Jagger. Sonya did not appeal the dispositional order setting forth the rehabilitative plan.

Periodic dispositional hearings were held involving both Hunter and Jagger. In orders filed October 1, 2003; March 17, May 14, and June 18, 2004; and January 3, 2005, the court continued the rehabilitation plan adopted on May 2, 2003, with minor changes. These orders noted that the primary permanency objective was reunification, but that an alternative permanency objective was adoption.

On May 3, 2004, in case No. S-05-537, the State filed a motion to terminate Sonya's parental rights to Hunter and Jagger pursuant to § 43-292(2), (6), and (7). On August 6, a petition was filed in a separate case in the juvenile court, concerning Phoenix, case No. S-05-536, alleging that she was a child within the meaning of § 43-247(3)(a) by reason of the fault and habits of Sonya.

In summary, this petition alleged that siblings of Phoenix had been adjudicated and were in state custody and that Sonya had failed to correct the conditions that had led to adjudication of those children. Following the filing of the State's petition, the juvenile court entered an order for temporary custody, placing Phoenix in the custody of DHHS. On August 12, the juvenile court entered an order continuing Phoenix's custody with DHHS. Phoenix was placed in foster care in August 2004. She has remained in foster care during the entirety of these proceedings. On August 12, the State filed a motion to terminate Sonya's parental rights to Phoenix pursuant to § 43-292(2).

On March 10, 2005, an evidentiary hearing was held on the August 6, 2004, petition seeking to adjudicate Phoenix and on the motions to terminate Sonya's parental rights as to Hunter, Jagger, and Phoenix. At the start of the hearing, the court heard argument on several motions filed by Sonya. One of these motions was a motion to dismiss the juvenile proceedings, in which motion Sonya claimed that the differing standards of proof between the NICWA, § 43-1501 et seq., which requires that the termination of parental rights to an Indian child be supported by evidence beyond a reasonable doubt, and § 43-279.01, which requires that the termination of parental rights to children not covered by the NICWA be supported by clear and convincing evidence, violated the equal protection guarantees under the U.S. and Nebraska Constitutions. Sonya argued that she was being discriminated against on the basis of race, because as the mother of non-Indian children, her parental rights could be terminated by a showing of clear and convincing evidence—a lower standard of proof. Sonya had also filed a motion to continue the proceedings in the juvenile case involving Jagger, because Jagger's father, Justin, who had had his parental rights terminated by an order entered on January 3, 2005, was appealing that decision. Sonya argued that the father's separate appeal divested the juvenile court of jurisdiction of the motion to terminate the mother's parental rights. Finally, Sonya had filed a motion seeking visitation in the event the court terminated her parental rights.

The juvenile court overruled each of Sonya's motions. The juvenile court determined there was no merit to Sonya's motions

to dismiss and to continue. As for the motion for visitation, the juvenile court determined it was premature, because, at the time it was filed, a decision had not been rendered on the motions to terminate parental rights.

Thereafter, the court heard testimony in both cases and received documentary evidence on the adjudication petition and the motions to terminate Sonya's parental rights. A total of five witnesses, including Sonya, testified, and multiple exhibits were admitted into evidence.

Kathryn Rogers, a protection and safety worker with DHHS, testified on behalf of the State. She stated that she had been assigned to the case since September 2004. She testified that Hunter had been in out-of-home placement since August 15, 2000, that Jagger had been in out-of-home placement since October 1, 2002, and that Phoenix had been in out-of-home placement since August 2004. She also testified concerning the children's current foster placement, in which all three children were living together with one family who planned on adopting the children in the event Sonya's parental rights were terminated. When asked if "there [had] been an ongoing problem regarding [Sonya's] being able to obtain and maintain safe and suitable housing for her children," Rogers answered, "Yes, there has." Rogers testified as to visits she had made to Sonya's home and stated that the kitchen "was dirty" and that the bathroom "was unsanitary." She testified that it had been documented that there were open alcohol bottles and ashtrays on the floor within reach of the children. Rogers also testified that despite provisions in the rehabilitation plans that required Sonya to receive individual therapy, Sonya had missed several appointments with her therapist and, in fact, had not met with her therapist during the 5 weeks prior to the termination hearing. Rogers also testified that Sonya had only "recently" obtained employment and that prior to her recent employment, "she had not had employment" since at least September 2004. Rogers testified as to Sonya's inconsistency in visiting her children and as to Sonya's failure to comply with the rehabilitation plan requirement that she advise DHHS of all third persons who were living with her. In response to the question as to whether Sonya had "followed the court orders in this case and participated in court ordered services to the point

where the children could be returned to her care," Rogers testified, "No, she has not." Rogers also testified that she did not believe that Sonya had corrected the conditions that had led to the juvenile court's adjudication of Hunter and Jagger.

Dr. Karen Sharer-Mohatt, a clinical psychologist, testified concerning the psychological evaluation she performed on Sonya in May 2004. Sharer-Mohatt testified that "Sonya [had] a lifelong pattern of unhealthy relationships" which had led to violence and personal instability in Sonya's life. Sharer-Mohatt testified that this pattern "appeared to be generational [a]nd ha[d] now extended to [Sonya's] children as well." Sharer-Mohatt testified that Sonya had undergone a number of therapeutic interventions "with minimal success in re-establishing stability in her life." Sharer-Mohatt also testified as to a number of "barriers" to Sonya's being able to effectively parent her children, including "her pattern of instability . . . her difficulty in maintaining adequate housing, her difficulty in providing consistent, healthy parenting to her children on a long term . . . basis, her . . . history with depression and anger issues[, and] the inconsistency with which she had offered parenting to her . . . children." A copy of Sharer-Mohatt's May 2004 psychological evaluation report was introduced into evidence. The report states that "[i]t does not appear at this time that Sonya is prepared to have full responsibility and custody of her children. . . . Sonya's problems in attachment makes [sic] it difficult for her to fully connect with her children and understand and appreciate the impact of her behaviors on her children."

As stated above, Sonya appeared and testified during the termination hearing. Sonya stated that she had been employed as a cabdriver since January 2005. She also testified that prior to her employment as a cabdriver, the last time she had been employed was in 2003. On cross-examination, she agreed that she had missed almost 30 of the weekly therapy sessions for which she had been scheduled in 2004. Sonya nevertheless testified that she was, at the time of the hearing, interested in being reunited with her children.

On March 30 and 31, 2005, the juvenile court entered separate orders in the juvenile case involving Hunter and Jagger and in the juvenile case involving Phoenix. With regard to the

State's petition seeking to adjudicate Phoenix, the juvenile court found by a preponderance of the evidence that pursuant to § 43-247(3)(a), Phoenix lacked proper parental care by reason of the fault and habits of Sonya in that Hunter and Jagger, siblings of Phoenix, had previously been adjudicated under § 43-247(3)(a) and that Sonya had failed to correct the conditions leading to those adjudications. With regard to the State's motions to terminate Sonya's parental rights, the juvenile court found that the allegations in those motions had been proved by clear and convincing evidence and that the motions should be granted. Specifically, in its order filed in case No. S-05-537, the juvenile court found that with regard to Hunter and Jagger, Sonya's parental rights should be terminated pursuant to § 43-292(2), (6), and (7), because Sonya had "substantially and continuously or repeatedly neglected and refused to give [Hunter and Jagger] necessary parental care and protection; [and had] failed to correct the conditions leading to the determination that [Hunter and Jagger were] children as defined by [§ 43-247(3)(a)]." The juvenile court further found that Hunter and Jagger had been in an out-of-home placement for 15 or more of the most recent 22 months. In its separate order filed in case No. S-05-536, the juvenile court found that Sonya's parental rights to Phoenix should be terminated pursuant to § 43-292(2), because Sonya had "substantially and continuously or repeatedly neglected and refused to give [Phoenix or Phoenix's siblings] necessary parental care and protection." In its orders, the juvenile court further found that termination of Sonya's parental rights to Hunter, Jagger, and Phoenix was in the children's best interests. Sonya appeals from these orders.

### III. ASSIGNMENTS OF ERROR

On appeal, Sonya has assigned numerous errors, the primary ones of which we restate and summarize below. Sonya claims, restated, that the juvenile court erred in (1) failing to find that § 43-279.01(3) was unconstitutional because it violated Sonya's right to equal protection pursuant to the 14th Amendment to the U.S. Constitution and article I, § 3, of the Nebraska Constitution; (2) overruling Sonya's motion to continue due to the juvenile court's lack of jurisdiction; (3) finding that as to the adjudication

of Phoenix, the allegations made pursuant to § 43-247(3)(a) were proved by a preponderance of the evidence; (4) finding that as to all three children, there was clear and convincing evidence to terminate her parental rights; and (5) finding that as to all three children, the termination of Sonya's parental rights was in the children's best interests.

## IV. STANDARDS OF REVIEW

■ Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *Polikov v. Neth, ante* p. 29, 699 N.W.2d 802 (2005).

■ A jurisdictional question that does not involve a factual dispute is a matter of law that requires an appellate court to reach an independent conclusion irrespective of the determination made by the court below. See *In re Application of Metropolitan Util. Dist., ante* p. 494, 704 N.W.2d 237 (2005).

■ Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. THE BURDEN OF PROOF REQUIRED TO TERMINATE PARENTAL RIGHTS OF PARENTS OF NON-INDIAN CHILDREN IN § 43-279.01(3) DOES NOT VIOLATE EQUAL PROTECTION

Sonya claims that § 43-279.01(3) is unconstitutional and that the juvenile court erred when it concluded that § 43-279.01(3) did not violate equal protection guarantees. Sonya asserts that the juvenile court erred in failing to find that the differing standards of proof required to terminate parental rights found in the NICWA and § 43-279.01(3) violated her right to equal protection pursuant to the 14th Amendment to the U.S. Constitution and article I, § 3, of the Nebraska Constitution. Sonya argues that because the burden of proof required to terminate parental rights to non-Indian children under § 43-279.01(3), to which

she was subject, is a lesser standard of proof than that required to terminate parental rights to Indian children under the NICWA, § 43-1505(6), parents subject to § 43-279.01(3) are discriminated against on the basis of race. We conclude that Sonya has failed to establish § 43-279.01(3) violates equal protection guarantees and further conclude that the juvenile court did not err when it rejected Sonya's constitutional challenge to § 43-279.01(3).

With reference to the burden of proof required to terminate the parental rights of a non-Indian child, § 43-279.01(3) provides as follows: "After hearing the evidence, the court shall make a finding . . . by clear and convincing evidence in proceedings to terminate parental rights." Section 43-279.01(3) continues: "If an Indian child is involved, the standard of proof shall be in compliance with the Nebraska Indian Child Welfare Act, if applicable." With reference to the burden of proof required to terminate the parental rights of an Indian child, the NICWA at § 43-1505(6) provides: "No termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt . . . that the continued custody of the [Indian] child by the parent . . . is likely to result in serious emotional or physical damage to the child."

The amount of proof under the clear and convincing standard has been described as that amount of evidence that produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved, *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005), whereas the amount of evidence required to satisfy proof beyond a reasonable doubt has been described as "proof so convincing that one would rely and act upon it without hesitation in the more serious and important transactions of life," *In re Interest of Phoebe S. & Rebekah S.*, 11 Neb. App. 919, 935, 664 N.W.2d 470, 483 (2003). Clear and convincing is a lower standard of proof than proof beyond a reasonable doubt. See *State v. Putz*, 266 Neb. 37, 662 N.W.2d 606 (2003).

Sonya brings an equal protection challenge in this case. The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges. *Mach v. County of Douglas*, 259 Neb. 787, 612 N.W.2d 237 (2000).

Therefore, we do not distinguish between the two constitutions in our analysis of this issue. The principle of equal protection guarantees that similar persons will be dealt with similarly by the state, but it does not foreclose the state from classifying persons or from differentiating one class from another when enacting legislation. *Waste Connections of Neb. v. City of Lincoln*, 269 Neb. 855, 697 N.W.2d 256 (2005). The Equal Protection Clause simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike. *Id.*

The party attacking a statute as violative of equal protection has the burden to prove that the classification violates the principle of equal protection. See *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003). The initial inquiry in an equal protection analysis focuses on whether the challenger is similarly situated to another group for the purpose of the challenged governmental action. Absent this threshold showing, one lacks a viable equal protection claim. *Hass v. Neth*, 265 Neb. 321, 657 N.W.2d 11 (2003). As explained below, as to the termination of parental rights legislation at issue, the parents of non-Indian children are not similarly situated to the parents of Indian children and, therefore, the parents of non-Indian children lack a viable equal protection claim.

Pursuant to its federal constitutional authority, Congress enacted the Indian Child Welfare Act of 1978 (ICWA)

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

25 U.S.C. § 1902 (2000). See *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989).

By its terms, Nebraska's statute regarding Indian children, § 43-1502, states:

> The purpose of the [NICWA] is to clarify state policies and procedures regarding the implementation by the State of Nebraska of the federal Indian Child Welfare Act, 25 U.S.C. 1901 et seq. It shall be the policy of this state to

cooperate fully with Indian tribes in Nebraska in order to ensure that the intent and provisions of the [ICWA] are enforced.

The intent of the ICWA is evident in the statute itself. In its findings recited at 25 U.S.C. § 1901 (2000), Congress recognized the special relationship between the United States and the Indian tribes and the federal responsibility to Indian people. Congress explicitly found, inter alia,

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901.

Sonya characterizes her challenge to § 43-279.01(3) as one implicating racial discrimination. Contrary to her characterization, the difference in the statutes implicated in this case between the parents of non-Indian as distinguished from Indian children is attributable not to race but is attributable to and is an incident of the historical sovereignty of Indian tribes. The U.S. Supreme Court long ago noted that Indian tribes are unique aggregations possessing "attributes of sovereignty" over both their members and their territory, see *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1832), and has further noted that federal legislation that differentiates between Indian and non-Indian individuals is not based upon a racial classification, but instead is based upon the Indians' status "as members of

quasi-sovereign tribal entities." *Morton v. Mancari*, 417 U.S. 535, 554, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974).

The U.S. Supreme Court has observed that "classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution and supported by the ensuing history of the Federal Government's relations with Indians." *United States v. Antelope*, 430 U.S. 641, 645 & n.6, 97 S. Ct. 1395, 51 L. Ed. 2d 701 (1977) (stating "Article I, § 8, of the Constitution gives Congress power '[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes' "). Given the foregoing, federal laws regulating Indian affairs are not based upon racial classifications, but, rather, are "rooted in the unique status of Indians as 'a separate people' with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a ' "racial" group consisting of "Indians" . . . .' " *United States v. Antelope*, 430 U.S. at 646 (quoting *Morton v. Mancari, supra*). The U.S. Supreme Court has observed that "[o]n numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment." *Morton v. Mancari*, 417 U.S. at 554-55. The U.S. Supreme Court has further noted:

> Literally every piece of [federal] legislation dealing with Indian tribes . . . single[s] out for special treatment a constituency of tribal Indians . . . . If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire title of the United States Code (25 U. S. C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.

417 U.S. at 552.

In summary, in reviewing its own jurisprudence, the U.S. Supreme Court has stated that its decisions "leave no doubt that federal legislation with regard to Indian tribes, although relating to Indian tribes as such, is not based upon impermissible racial classifications" and does not violate equal protection. *United States v. Antelope*, 430 U.S. at 645. We logically extend this reasoning to the instant case and conclude that Nebraska

legislation that differentiates between the parents of Indian and non-Indian children relative to the burden of proof for termination of parental rights is not due to racial discrimination. Given the United States' history in dealing with Indians and the U.S. Supreme Court's decisions with regard to legislation pertaining thereto, we conclude as a matter of law that the lower standard of proof under § 43-279.01(3) for the termination of parental rights to non-Indian children, as opposed to the higher standard of proof under the NICWA, does not violate the equal protection rights of parents of non-Indian children.

The initial inquiry in an equal protection analysis focuses on whether one has demonstrated that one was treated differently from others similarly situated; absent this threshold showing, one lacks a viable equal protection claim. *Hass v. Neth*, 265 Neb. 321, 657 N.W.2d 11 (2003). It follows that the dissimilar treatment of dissimilarly situated persons does not violate equal protection rights. *State v. Atkins*, 250 Neb. 315, 549 N.W.2d 159 (1996).

On this record, no one claims that Hunter, Jagger, and Phoenix are Indian children for the purposes of the NICWA, and it is therefore undisputed that Sonya is the parent of non-Indian children for purposes of our analysis. "The Indian's special status, stemming from the historical relationship between the United States and a sovereign indigenous people, as well as the legislative goal of the ICWA, to keep Indian families from disruption," situates the parent of an Indian child differently from the parent of a non-Indian child. *In re Marcus S.*, 638 A.2d 1158, 1159 (Me. 1994). Thus, contrary to the assertion raised by Sonya, she is not similarly situated to a parent of an Indian child, and in view of the differing circumstances, Sonya has not brought a viable equal protection claim.

In reaching our conclusion that the standard of proof in § 43-279.01(3) does not violate equal protection guarantees, we note that other state courts have reached a similar result. See, *Ruby A. v. State, Dept. of Health and Social Services*, Nos. S-10921, S-10933, 2003 WL 23018276 at *4 (Alaska Dec. 29, 2003) (unpublished opinion) (rejecting claim that lower court violated non-Indian father's equal protection rights by failing to apply ICWA's "beyond a reasonable doubt" standard of proof);

*In re Marcus S., supra* (concluding that state law did not violate Equal Protection Clause by requiring lesser burden of proof than ICWA in proceedings to terminate parental rights); *Matter of M.K.*, 964 P.2d 241 (Okla. Civ. App. 1998) (concluding that trial court's refusal to apply to non-Indian father ICWA's heightened standard of proof for termination of parental rights did not violate father's right to equal protection); *State ex rel. CSD v. Graves*, 118 Or. App. 488, 848 P.2d 133 (1993) (determining that different treatment of Indians and of non-Indians resulting from proof beyond reasonable doubt requirement under ICWA as opposed to state law which permitted parental rights to be terminated on clear and convincing evidence does not violate equal protection). Compare *Application of Angus*, 60 Or. App. 546, 655 P.2d 208 (1982) (concluding that provisions of ICWA do not deny equal protection to non-Indians), *review denied* 294 Or. 569, 660 P.2d 683, *cert. denied sub nom. Woodruff et ux. v. Angus, Next Friend of Angus, et al.*, 464 U.S. 830, 104 S. Ct. 107, 78 L. Ed. 2d 109 (1983).

In summary, Sonya, as the parent of non-Indian children, is not similarly situated to an Indian parent, and thus, Sonya has failed to make a threshold showing demonstrating that as to the burden of proof for the termination of parental rights, she was treated differently from others similarly situated. Sonya lacks a viable equal protection claim. The trial court did not err when it rejected Sonya's claim that § 43-279.01(3) was unconstitutional because it violated the equal protection rights of non-Indian parents.

## 2. The Procedural and Substantive Rulings of the Juvenile Court Were Not in Error

### (a) The Juvenile Court Had Jurisdiction to Terminate Sonya's Parental Rights

Sonya claims that the juvenile court was without jurisdiction in case No. S-05-537 when it terminated her parental rights. Sonya claims that the juvenile court was divested of jurisdiction because Justin, the biological father of Jagger, was appealing a separate order terminating his parental rights when Sonya's parental rights in case No. S-05-537 were considered. Sonya misperceives the law in this area. In *In re Interest of Joshua M.*

*et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997), we stated that a juvenile court does not have jurisdiction to terminate a juvenile's relationship with his or her parent while an appeal by that parent is pending in that juvenile case. However, that decision was limited to a circumstance where the mother was appealing an order removing her children, and we concluded that the pendency of that appeal precluded consideration of the State's petition to terminate the mother's parental rights. The record in this appeal shows that Justin's case is essentially separate from Sonya's case and is based upon different facts. Given these circumstances, we conclude the juvenile court was not divested of jurisdiction to terminate Sonya's parental rights in case No. S-05-537 during the pendency of the appeal of the order terminating Justin's parental rights to Jagger. Accordingly, this assignment of error is without merit.

### (b) The Juvenile Court Did Not Err in Adjudicating Phoenix as a Child Under § 43-247(3)(a)

Sonya claims in case No. S-05-536 that the juvenile court erred in finding that Phoenix was a juvenile within the meaning of § 43-247(3)(a). Following our de novo review of the record, we conclude that the juvenile court did not err in finding that the State had proved by a preponderance of the evidence that Phoenix lacked proper parental care by reason of the fault or habits of Sonya for purposes of § 43-247(3)(a). Accordingly, we affirm the adjudication portion of the juvenile court's order.

In the State's petition filed on August 6, 2004, in case No. S-05-536, it alleged that Phoenix came within the meaning of § 43-247(3)(a) because siblings of Phoenix had been previously adjudicated and Sonya had failed to correct the conditions that had led to those adjudications. The evidence adduced at the hearing indicated that notwithstanding the fact that Hunter had been removed from Sonya's care in August 2000 and adjudicated in October 2000 due to Sonya's inability to provide proper care and support, and the fact that Jagger had been removed from Sonya's care in October 2002 and adjudicated in April 2003, also due to Sonya's inability to provide proper care and support, Sonya had failed to correct the conditions that led to these adjudications. These conditions included failing to maintain safe and suitable

housing for the children and failing, until January 2005, to obtain employment that would enable her to financially support the children. Based on the foregoing, we conclude that the portion of the juvenile court's order that adjudicated Phoenix to be a child within the meaning of § 43-247(3)(a) should be affirmed.

### (c) The Juvenile Court Did Not Err in Terminating Sonya's Parental Rights

Sonya claims on appeal that the evidence in cases Nos. S-05-536 and S-05-537 was insufficient to terminate her parental rights to Hunter, Jagger, and Phoenix. In case No. S-05-537, the juvenile court found that termination had been proved as to Hunter and Jagger under § 43-292(2), (6), and (7). In case No. S-05-536, the juvenile court found that one statutory ground had been proved as to Phoenix under § 43-292(2). Because we determine that the evidence clearly and convincingly demonstrates that Hunter and Jagger were in an out-of-home placement for at least 15 of the most recent 22 months, we affirm the juvenile court's order terminating Sonya's parental rights to Hunter and Jagger under § 43-292(7), and we need not, and do not, further specifically address the sufficiency of the evidence under § 43-292(2) and (6). Because we determine that the evidence clearly and convincingly demonstrates that Sonya has substantially and continuously or repeatedly neglected and refused to give Phoenix and her siblings necessary parental care and protection, we affirm the juvenile court's order terminating Sonya's parental rights to Phoenix under § 43-292(2).

For a juvenile court to terminate parental rights under § 43-292, it must find that termination is in the child's best interests and that one or more of the statutory grounds listed in this section have been satisfied. *In re Interest of Shelby L., ante* p. 150, 699 N.W.2d 392 (2005). The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need

not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002).

■ Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Thus, in order to terminate parental rights under § 43-292(7), the State must prove by clear and convincing evidence that the child has been in out-of-home placement for 15 or more of the most recent 22 months and that termination of parental rights is in the best interests of the child. See *In re Interest of Aaron D., supra.* Along with proof of best interests, § 43-292(7) is satisfied if the evidence shows the requisite number of months of out-of-home placement. *In re Interest of Aaron D., supra.*

In the present case, there is no dispute that Hunter has been in an out-of-home placement continuously since August 2000, which was more than 44 months prior to the time the motion to terminate was filed and more than 55 months at the time of the juvenile court's termination order as to Hunter was entered. There is also no dispute that Jagger has been in an out-of-home placement continuously since October 2002, which was more than 19 months prior to the time the motion to terminate was filed and more than 29 months at the time the juvenile court's termination order as to Jagger was entered. Thus, there is clear and convincing evidence that Hunter and Jagger had been in out-of-home placement for 15 of the most recent 22 months pursuant to § 43-292(7). Accordingly, because we also conclude *infra* that termination is in their best interests, Sonya's assignment of error challenging the basis for termination of her parental rights to Hunter and Jagger under § 43-292(7) is without merit.

We also determine that the juvenile court did not err in terminating Sonya's parental rights as to Phoenix under § 43-292(2), which provides for termination of parental rights when "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection" and the termination is in the child's best interests. As stated above, at the time of the termination hearing, Hunter had been in foster care for

more than 4 years and Jagger had been in foster care for more that 2 years. It is clear from the record that Sonya was unable or unwilling to provide necessary parental care and protection for these children. The record reflects that Sonya has failed to demonstrate that she can provide adequate, safe housing. Rogers testified that she had found conditions in Sonya's apartment "very dirty" and "unsanitary." Moreover, Sonya has failed to comply with the juvenile court's rehabilitation plans entered in Hunter and Jagger's case requiring that she participate in individual counseling and inform DHHS of third persons living with her. Despite the requirement in the juvenile court's rehabilitation plans since 2003 that Sonya obtain and maintain suitable employment, Sonya was unemployed during the entirety of 2004 and did not obtain full-time employment until January 2005, less than 3 months prior to the termination hearing and more than 9 months after the motion to terminate her parental rights to Hunter and Jagger was filed. Additionally, according to Sharer-Mohatt's psychological evaluation, Sonya has engaged in a "lifelong pattern of unhealthy relationships" and, although she had participated in a "number of different types of therapeutic interventions," Sonya has achieved only "minimal success." According to Sharer-Mohatt's evaluation, Sonya's "problems in attachment" make it "difficult" for her to connect with her children "and understand and appreciate the impact of her behaviors on her children." In summary, the record reflects that Sonya had been given more than 4 years to demonstrate that she was capable of caring for her children and has continuously and repeatedly failed to do so. Thus, there is clear and convincing evidence that Sonya has substantially and continuously or repeatedly neglected and refused to give Phoenix and Phoenix's siblings necessary parental care and protection. Accordingly, the assignment of error challenging the basis for termination of Sonya's parental rights to Phoenix under § 43-292(2) is without merit.

### (d) The Termination of Sonya's Parental Rights Is in the Children's Best Interests

Sonya contends that the State did not prove by clear and convincing evidence that termination of her parental rights was in the best interests of Hunter, Jagger, and Phoenix. This

court has stated that when "a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights." *In re Interest of Joshua M. et al.*, 251 Neb. 614, 636, 558 N.W.2d 548, 563 (1997). We have further recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* The concept of permanency in the life of a child is a recognition that when

> there is no reasonable expectation that a natural parent will fulfill his or her responsibility to a child, the child should be given an opportunity to live with an adult who has demonstrated a willingness and ability to assume that responsibility and has a permanent legal obligation to do so.

(Emphasis omitted.) *In re Interest of Sunshine A. et al.*, 258 Neb. 148, 158, 602 N.W.2d 452, 460 (1999). These propositions of law have direct application to Hunter, Jagger, and Phoenix. The record reflects that despite 4 years of rehabilitation plans, Sonya has been unable or unwilling to rehabilitate herself. There is evidence in the record that the foster family with whom the children live wish to adopt all three of the children. There is also evidence from which it could be determined that adoption and permanency with this foster family would provide the children with secure and healthy lives. Given these circumstances and the entire record in this case, which we have reviewed de novo, we conclude that there exists clear and convincing evidence that terminating Sonya's parental rights is in the best interests of Hunter, Jagger, and Phoenix. This assigned error is without merit.

### (d) Sonya's Additional Assignments of Error Are Without Merit

We have considered Sonya's remaining assignments of error, and we conclude they are without merit.

### VI. CONCLUSION

For the reasons stated above, we conclude the trial court did not err in failing to find that § 43-279.01(3) was unconstitutional as violative of equal protection because Sonya failed to make a threshold showing demonstrating that she was similarly situated to another group for the purpose of the challenged governmental

action. Specifically, she failed to show that as the parent of non-Indian children, she was situated similarly to parents of Indian children for purposes of the termination of parental rights and the statutory proof relative thereto. We further conclude that contrary to Sonya's claim, the juvenile court did not lack jurisdiction to rule on the State's motions to terminate Sonya's parental rights during the pendency of Justin's appeal in an essentially separate proceeding. We conclude that the juvenile court's order adjudicating Phoenix to be a child within the meaning of § 43-247(3)(a) was supported by a preponderance of the evidence. We further conclude that there was clear and convincing evidence to support a finding that Sonya's parental rights to Hunter and Jagger should be terminated pursuant to § 43-292(7) and that Sonya's parental rights to Phoenix should be terminated pursuant to § 43-292(2). We further conclude that termination is in the best interests of Hunter, Jagger, and Phoenix. The orders of the juvenile court terminating Sonya's parental rights to Hunter, Jagger, and Phoenix are affirmed.

AFFIRMED.