782 N.W.2d 330 (2010)
18 Neb. App. 389
In re INTEREST of EMMA J., a child under 18 years of age.
State of Nebraska, appellee,
v.
Geneo J., appellant.
No. A-09-1031.
Court of Appeals of Nebraska.
May 11, 2010.
*331 Laura A. Lowe, P.C., Lincoln, for appellant.
Gary Lacey, Lancaster County Attorney, and Barbara J. Armstead, Gering, for appellee.
INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.
INBODY, Chief Judge.

INTRODUCTION
Geneo J. appeals from an order of the separate juvenile court of Lancaster County, adjudicating his minor child, Emma J., as a juvenile within the meaning of Neb. Rev.Stat. § 43-247(3)(a) (Reissue 2008) and placing her outside of the home.

STATEMENT OF FACTS

Procedural History.
On May 20, 2009, the State filed a petition alleging that Emma was a child within the meaning of § 43-247(3)(a) by reason that Emma lacked proper parental care by reason of the faults or habits of her father, Geneo, and her mother, Venessa J. Specifically, the petition alleges that in 2007, Emma's older sisters, Eva J. and Shakeela J., were adjudicated as a result of being subjected to inappropriate physical discipline by Geneo, and that Venessa *332 had made threatening and rejecting statements and failed to protect Eva and Shakeela. The petition alleges that services designed to correct those matters were put into place, but did not correct the issue; that Geneo and Venessa relinquished their parental rights to Shakeela; and that Eva had turned 19 years of age and was no longer subject to the juvenile court's jurisdiction. The petition alleges that on May 18, 2009, Emma reported inappropriate discipline by Geneo, and that Geneo had threatened to force Emma to have an abortion. The petition also alleges that "active efforts have been made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and that these efforts have proven unsuccessful." As noted, the petition asserts that the case involves an "Indian family," but does not contain any specific references to the Indian Child Welfare Act (ICWA). A supplemental transcript was filed by the State which indicates that on June 10, the Omaha Tribe of Nebraska filed a motion to intervene because Emma was "an `Indian child' as defined by the [ICWA], 25 U.S.C. § 1903(4) and the Nebraska [ICWA]."
Additionally, the State filed an ex parte motion for temporary custody, which was granted by the juvenile court, and Emma was placed with a foster family, specifically the family with whom her older sisters, Eva and Shakeela, were placed and where Shakeela still resided. Also included by the State in the supplemental transcript is an order continuing temporary custody with the Nebraska Department of Health and Human Services (DHHS), which order indicates that the juvenile court determined that Emma's therapist was an expert witness who testified that continued custody of Emma with Geneo would result in serious emotional or physical damage and that active efforts "including a pretreatment assessment, visitation for [Venessa], counseling services, and a comprehensive family assessment have been made or are being offered to the family to provide remedial services and rehabilitation programs designed to prevent the breakup of the family and those efforts have proved unsuccessful."
On August 5, 2009, the State also filed a motion to allow Emma to testify in chambers alleging that Geneo's or Venessa's presence during her testimony could be harmful to her. After a hearing on the motion, the juvenile court sustained the State's motion and allowed Emma to testify in court, with Geneo and Venessa outside of the courtroom in conference rooms. During which time, Geneo's counsel was given leave every 15 minutes to leave the courtroom and confer with Geneo. Also, Geneo was allowed to view the recording of the testimony and further examine Emma at the continued hearing date.
On August 20 and September 29, 2009, the matter came on for hearing for adjudication on the petition. Geneo and Venessa entered denials on the allegations, and testimony and evidence were submitted to the juvenile court.

Adjudication Hearing Testimony.
At the adjudication hearing, Emma testified that she was 15 years old and was a junior at a high school in Lincoln, Nebraska. Emma testified that she was involved in high school softball and basketball and that during the spring of 2009, she participated on the high school track team. During a track meet on May 14, Emma participated in the 800-meter relay race, but her family did not see her run because they arrived after her race had already concluded. Emma indicated that after her race, she hung out with friends and her boyfriend. Emma agreed that her parents did not approve of her boyfriend because they believed him to be a bad influence *333 and that she was not supposed to be around him. Emma testified that as a result of hanging out with her boyfriend at the track meet, she was grounded and ordered by Geneo to quit the track team.
Emma testified that on May 15, 2009, a Friday, Geneo picked up both her and one of her brothers, Tommy J., and inquired of Tommy as to whether Emma had been with her boyfriend that day. Tommy indicated that he had seen Emma and her boyfriend speaking at school. Emma testified that she got out of the car and went upstairs to her room because she knew she was going to be in trouble for speaking to her boyfriend. Emma explained that Geneo followed her to her room, yelled at her, and hit her with a closed fist above her left ear on the back of her head and that she fell down. Emma testified that Geneo ordered her to go downstairs and stand on her tiptoes in the kitchen corner. Emma testified that once she was in the corner, Geneo continued to yell at her, compared her to her older sisters, and told her he wished he had no daughters. Emma testified that during this time, her mother, Venessa, was home, along with Tommy and her older half brother, Angelo S., and their small children, but they had gone upstairs to avoid the yelling. Emma explained that Geneo hit her approximately five times with a closed fist and grabbed her around the neck and threw her across the kitchen. Emma explained that it hurt when Geneo hit her and that she caught herself as she hit the counter and the stove. Emma testified that at that time, her mother came in and told Geneo to stop.
Emma testified that Geneo left the house to go to her boyfriend's house and that she remained in the corner because she was upset and did not want to speak with anyone. Shortly thereafter, Geneo returned and the police also arrived at the home. Emma testified that Geneo told her to go wash her face and that he then ordered her to come and speak with the police. Emma explained that two police officers were outside of the home and that she did not tell either officer about the incident which had just taken place with Geneo because both Geneo and Venessa were standing right there and she was scared to tell the police anything.
Emma testified that she was grounded and that no other incident occurred between her and Geneo during the weekend. Emma indicated that on Monday, she did not want to return home and that instead, she contacted her sister Shakeela. Emma testified that she told her sisters and their foster mother about the incident which had occurred on Friday and that she contacted the police to file an abuse report. Emma testified that when the police arrived at the foster family's home, she told a police officer everything about Friday's incidents, including that she was scared to return home. Emma also indicated that Geneo had thought she was pregnant, even though she was not and had not told anyone that she was.
Emma also testified that in February 2009, Geneo had hit her in the head with a closed fist. Emma explained that when she was younger, Geneo used a belt to discipline her, but that as she got older, he used his fists and hands. Emma also explained that on numerous occasions, Geneo would call her a "ho," "whore," and "slut."
Chris Fields, an officer with the Lincoln Police Department, testified that on May 15, 2009, he responded to a call for a child welfare check of Emma at Geneo and Venessa's residence. Fields testified that he spoke with Geneo and Emma and that he did not observe any marks on Emma's face or neck. Fields testified that Emma refused to step away from the house and that he was not able to speak with Emma *334 outside of the presence of Geneo. Fields testified that Emma was crying and upset and indicated to him she was grounded, but that she did not tell Fields she had been hurt by Geneo. Fields explained that as a result of his contact with Geneo and Emma, he did not feel further action was necessary, and that he believed Emma was safe.
Tommy, one of Emma's older brothers, testified that on May 15, 2009, he told Geneo that Emma had been with her boyfriend and Geneo called Emma to come downstairs when Geneo came in the house. Tommy testified that Geneo was not yelling at Emma, but he simply had a deep voice. Tommy testified that he saw Emma in the corner in the kitchen and that he heard a loud bang from the kitchen area around that time, but did not see anything else because he and the other members of the family were upstairs. Tommy testified that the family was together throughout the weekend and that Emma did not talk about any injuries.
Angelo, Emma's older half brother, testified that he was at Geneo's home on May 15, 2009, and heard Geneo yelling at Emma. Angelo also heard a loud bang from the kitchen during the yelling, but he did not see anything because he was upstairs. Angelo testified that when he returned downstairs, Geneo was gone and Emma was standing in the corner. Angelo explained that Emma did not appear to be in any physical distress at that time. Angelo testified that he graduated from college that weekend and that Emma was busy during that time with her mother and other friends and family planning and organizing his graduation party.
The director of church relations for the People's City Mission, who was Geneo's pastor, testified that on Saturday, May 16, 2009, Geneo brought Emma to the pastor's home to speak with her about her relationship with Geneo and the choices she was making. Geneo's pastor testified that he did not observe any bruises or marks on Emma and that Emma did not indicate that Geneo had harmed her in any way. Geneo's pastor explained that Geneo was at his "wit's end" and that it was probably a good idea that Emma be somewhere else where she would receive supervision that she would listen to.
Tyler Cooper, an officer with the Lincoln Police Department, testified that on May 18, 2009, he received a call that Emma was missing and had run away. On the way to Geneo and Venessa's home, he received another call reporting that Geneo had abused Emma. Cooper testified that he took a runaway report from Geneo and Venessa, during which Geneo told Cooper that he had heard Emma was pregnant and that if he found her, he was going "to make her have an abortion as it was his right because he's [Emma's] father." Cooper testified that Emma had reported to him that Geneo had hit her on the right side of the head, made her stand in the corner, grabbed her by the neck, threw her into the kitchen, and threw things at her. Cooper testified that he did not see any bruising or marks on Emma and that she did not report that Geneo had hit her five times. However, Cooper explained that after speaking with Child Protective Services, he determined that it was appropriate to take Emma into protective custody because Emma's circumstances were very similar to past instances involving Geneo and Emma's older sisters and that there was also an additional abuse report made by Emma the week before, even though that report was unfounded.
Dawn Moore, also an officer with the Lincoln Police Department, testified that she was called to the foster family's residence on May 18, 2009, to take photographs of Emma. Moore testified that she *335 took photographs of Emma's arms, back, and hips and did not observe any markings or bruising. Moore testified that in the course of her duties, she has worked with victims of assault, and that injuries or marks are not dispositive of whether an assault actually occurred.
Kim Bro, an initial assessment worker for DHHS, testified that she became involved with Emma's case in February 2009, when Emma was still living in Geneo's home. Bro explained that on May 19, she went to Emma's high school to speak with Emma. Bro testified that, on that same day, she also contacted Geneo and Venessa and that Venessa indicated several times that day that she did not want to see Emma and had wasted too much time on her older daughters and was not going to waste any more time with Emma. Bro testified that Geneo also indicated that he did not want to see Emma and further that he did not understand what the problem was because "he had done nothing to her worse than had been done to him in prison." Bro indicated that during each of her conversations with Geneo, he was very angry, and that she ended several conversations with him because he would become verbally abusive. Bro testified that she conducted two separate in-person interviews with Geneo and Venessa, in addition to the various telephone conversations. Bro testified that she knew other people were in the home during the May 15 incident, but she did not speak with them as Geneo had told her she was not allowed to speak with them. Bro testified that, in her opinion, she did not recommend that Emma be placed with Geneo or Venessa because she was concerned for Emma's safety based upon the allegations of abuse.
After taking the matter under advisement, the juvenile court found that all of the allegations in the petition were true by clear and convincing evidence, adjudicated Emma as a child within the meaning of § 43-247(3)(a), and determined that Emma lacked proper care by reason of the fault or habits of Geneo and Venessa. The juvenile court found that active efforts have been made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and that those efforts have been unsuccessful. The court also ordered that all temporary orders issued in the case remain in full force and effect pending a predisposition report to be completed by DHHS. From this order, Geneo has timely appealed. Venessa did not file a notice of appeal.

ASSIGNMENTS OF ERROR
Geneo assigns that the juvenile court erred by adjudicating Emma as within the meaning of § 43-247(3)(a), determining that the active efforts were made to prevent the breakup of the Indian family, and continuing out-of-home placement orders without the expert testimony required under ICWA. See Neb.Rev.Stat. §§ 43-1501 to 43-1516 (Reissue 2008).

STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. In re Interest of Taylor W., 276 Neb. 679, 757 N.W.2d 1 (2008); In re Interest of Jagger L., 270 Neb. 828, 708 N.W.2d 802 (2006); In re Interest of Shayla H., 17 Neb.App. 436, 764 N.W.2d 119 (2009). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. In re Interest of Jagger L., supra.

ANALYSIS

Adjudication.
Geneo contends that the juvenile court erred by adjudicating Emma as a child *336 within the meaning of § 43-247(3)(a). Specifically, Geneo argues that, in accordance with In re Interest of Phoenix, 270 Neb. 870, 708 N.W.2d 786 (2006), when adjudicating a petition involving an Indian family, the State has a heightened burden to prove the allegations by clear and convincing evidence. The State argues that, for the adjudication phase of the proceedings, the burden of proof remains a preponderance of the evidence.
Let us start with our review of In re Interest of Phoenix, supra. We find that Geneo's reliance upon this case for the proposition of the heightened burden of proof for an ICWA adjudication is misplaced. A closer reading of In re Interest of Phoenix indicates that the language from which Geneo chooses to rely upon, in full, deals with the burden of proof for the termination of parental rights for non-Indian children and does not place upon the State the burden of proving the allegations in an adjudication petition by clear and convincing evidence.
We agree with the State that there is no authority for an enhanced burden of proof in an ICWA adjudication; there is, however, an indication in the cases involving said subject matter that the standard most generally applied at the juvenile court level in ICWA adjudication proceedings is clear and convincing evidence, although, the subject has not been directly addressed as a result of deciding the cases on other grounds. See, In re Interest of Shayla H., supra (trial court determined that State proved allegations contained in adjudication petition by clear and convincing evidence; assignment of error not addressed as case was reversed and remanded on other grounds); In re Interest of Dakota L., 14 Neb.App. 559, 712 N.W.2d 583 (2006) (trial court found that ICWA adjudication required enhanced burden of proof by clear and convincing evidence which was assigned as error by appellant but not addressed as case was reversed and remanded on other grounds); In re Interest of Enrique P. et al., 14 Neb.App. 453, 709 N.W.2d 676 (2006) (at adjudication hearing, trial court informed mother that burden of proof was enhanced to clear and convincing evidence as result of children's tribal enrollment status, but adjudicated children based upon preponderance of evidence, although no direct appeal was perfected from adjudication).
Generally, at the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. Neb.Rev.Stat. § 43-279.01(3) (Reissue 2008); In re Interest of B.R. et al., 270 Neb. 685, 708 N.W.2d 586 (2005); In re Interest of Rebekah T. et al., 11 Neb.App. 507, 654 N.W.2d 744 (2002).
The language of Nebraska's ICWA statutes does not specifically set forth any particular standard of proof for an adjudication proceeding; it does, however, expressly require the State to prove by clear and convincing evidence in the instance where a party is "seeking to effect a foster care placement of, or termination of parental rights, to an Indian child." § 43-1505(4). Whereas, § 43-247 specifically states that "[n]otwithstanding the provisions of the Nebraska Juvenile Code, the determination of jurisdiction over any Indian child as defined in section 43-1503 shall be subject to the Nebraska [ICWA]...." Therefore, having no language set forth within the ICWA statutes to indicate a heightened or enhanced burden of proof for the adjudication phase of the juvenile proceedings, we find that § 43-247(3)(a) requires that the State prove the allegations set forth in the petition by a preponderance of the evidence in *337 cases involving both non-Indian and Indian children.
Having made this determination, we turn to Geneo's argument that the State failed to meet its burden of proof, notwithstanding his assertion that the burden of proof for adjudicating a juvenile under ICWA is enhanced. Geneo argues that there was a "[l]ack of evidentiary nexus between [the] previous adjudication involving Shakeela and Eva and [the] risk of harm to Emma" and, furthermore, that there was no evidence that Geneo's statement to law enforcement that he would force Emma to have an abortion presented a situation of risk to Emma. Brief for appellant at 18 (emphasis omitted). Geneo contends that these circumstances are a direct result of "Emma's grand plan" to get what she wanted through fabrication and manipulation. Brief for appellant at 20.
In this case, the petition alleges that Emma's two older sisters were adjudicated in 2007 as a result of Geneo's subjecting them to inappropriate physical discipline and Venessa's failure to protect, that Geneo subjected Emma to inappropriate discipline, that Geneo threatened to force Emma to have an abortion, and that the matters leading to the adjudication of Emma's sisters remained uncorrected and placed Emma at risk of harm.
The record indicates that subsequent to the adjudication of Eva and Shakeela, Geneo and Venessa relinquished their parental rights to Shakeela, but Eva had turned 19 years of age and was no longer subject to the juvenile court's jurisdiction. The record indicates that the allegations arising out of Eva and Shakeela's petition are nearly identical to those involving Emma. Emma testified that on May 15, 2009, Geneo discovered that she had been talking to her boyfriend, even though Geneo had forbidden her to do so. Emma testified that Geneo yelled at her and hit her several times in the back of the head with a closed fist, pushed her down, and ordered her to go to the kitchen and stand in the corner. Emma testified that while she stood in the corner, Geneo continued to yell and hit her in the back of the head. Emma explained that Geneo called her a "ho," "whore," and "slut." Emma explained that Geneo grabbed her around her neck and threw her across the kitchen, at which point Venessa intervened and told Geneo to stop. Emma explained that when she was younger, he would discipline her by hitting her with a belt, but that as she got older, he would hit her with his fists and hands. Emma testified that she did not tell the police what had occurred when they were at the home on May 15, 2009, because she was scared since her mother and father were there. Emma testified that she did not call the police and that she participated in graduation events for her half brother during the weekend without incident. Emma explained that on Monday, May 18, she told Shakeela what happened on the Friday before and that she did not want to go home on Monday because she was still scared.
Emma testified that in the past, Geneo had accused her older sisters of being pregnant and had thought he assumed the same of her even though Emma testified that she was not pregnant and had never told him or anyone else that she was pregnant. Furthermore, Cooper testified that he took a runaway report from Geneo, during which time Geneo told Cooper that he had heard Emma was pregnant and that if he found her, he was going "to make her have an abortion as it was his right because he's [Emma's] father."
Geneo entered a denial of the allegations contained within the petition and presented testimony to refute Emma's assertions, generally attempting to show inconsistencies *338 in Emma's testimony regarding specific timeframes of the incident and Emma's continued contact with her boyfriend. However, we give weight to the fact that the juvenile court observed the witnesses and chose to believe Emma. See In re Interest of Monique H., 12 Neb.App. 612, 681 N.W.2d 423 (2004). Thus, upon our de novo review of the evidence in the record, it is clear that the State proved the elements of the petition for Emma's adjudication as a child within the meaning of § 43-247(3)(a) by a preponderance of the evidence.

Active Efforts and Expert Testimony.
Geneo argues the juvenile court erred in finding that the State made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and that those efforts were unsuccessful, and in removing Emma from the family home and placing her in foster care without expert testimony as required under ICWA.
Section 43-1505(4) provides:
Any party seeking to effect a foster care placement of ... an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
See, also, In re Interest of Louis S., 17 Neb.App. 867, 774 N.W.2d 416 (2009).
Additionally, pursuant to ICWA, qualified expert testimony is required on the issue of whether serious emotional harm or physical damage to the Indian child is likely to occur if the child is not removed from the home before foster care placement may be ordered. See § 43-1505(5).
Section 43-1505(5) provides:
No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
See In re Interest of Phoebe S. & Rebekah S., 11 Neb.App. 919, 664 N.W.2d 470 (2003).
Geneo asserts in his brief that the State presented no evidence as to what, if any, active efforts had been made to prevent Emma's placement in foster care and further failed to present any expert testimony. In response, the State claims that the evidence presented at a temporary custody hearing on June 11, 2009, supports the juvenile court's finding that active efforts had been made and the requisite expert testimony was given.
A supplemental transcript was filed by the State, containing a June 11, 2009, order regarding a motion for temporary custody in which the juvenile court found that active efforts had been made, including "a pretreatment assessment, visitation for [Venessa], counseling services, and a comprehensive family assessment." The order further indicates that the juvenile court determined that Emma's therapist "is a professional person having substantial education and experience in the area of her specialty." The juvenile court's September 30 order for adjudication specifically finds that active efforts had been made.
However, a close review indicates that, in the record before this court, there is no evidence regarding active efforts, nor is there any evidence of expert testimony. In fact, it is clear that the issue of active efforts was not further addressed by the State at the adjudication hearing, even though the juvenile court found that there had been sufficient active efforts. Even if this court were to presume that the issues *339 had been previously addressed by virtue of the June 11, 2009, order, which we do not, there is nothing in the record to substantiate that any efforts had been taken from that time until the adjudication, and no further expert testimony was given at the adjudication hearing.
We find that there is no evidence of any active efforts presented by the State and that there was no expert testimony given as required by ICWA to support continued out-of-home placement of Emma. Therefore, the juvenile court erred in determining that such efforts had been made and that such testimony was presented by the State.

CONCLUSION
In sum, we find that the proper burden of proof for the adjudication of an Indian child is by a preponderance of the evidence. In this case, the State proved by a preponderance of the evidence that Emma was a child within the meaning of § 43-247(3)(a) and we affirm the juvenile court's order of adjudication. However, we find that the record is devoid of any evidence of active efforts and expert testimony as required by ICWA for out-of-home placement of an Indian child. Therefore, we reverse the portion of the judgment ordering Emma's continued out-of-home placement. We further remand the cause with directions to return Emma to Geneo's home, unless a hearing is held to remove her from the home in compliance with ICWA.
AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.