IN RE INTEREST OF CHRISTOPHER R.,
A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. CHRISTOPHER R., APPELLEE,
AND NEBRASKA DEPARTMENT OF HEALTH AND HUMAN
SERVICES, OFFICE OF JUVENILE SERVICES, APPELLANT.
700 N.W.2d 668

Filed July 26, 2005.   No. A-04-1065.

Robert E. Wheeler, Special Assistant Attorney General, for appellant.

Brian J. Lockwood, Deputy Scotts Bluff County Public Defender, for appellee Christopher R.

INBODY, Chief Judge, and CARLSON and MOORE, Judges.

CARLSON, Judge.

## INTRODUCTION

The Nebraska Department of Health and Human Services, Office of Juvenile Services (OJS), appeals from an order of the county court for Scotts Bluff County, sitting as a juvenile court. In that order, the juvenile court denied OJS' request for a higher level of treatment for Christopher R., who had previously been adjudicated for the sexual abuse of minors and had been receiving treatment at the Lincoln Regional Center (LRC). The court ordered that Christopher be returned to his parents' care and overruled OJS' motion to discharge Christopher from OJS' custody. For the reasons set forth below, we reverse, and remand with directions.

## BACKGROUND

On May 3, 2002, the deputy county attorney for Scotts Bluff County filed a petition alleging that in 1999 or 2000, Christopher, born October 7, 1988, attempted to subject M.A., a minor, to sexual penetration without M.A.'s consent. The petition also stated that in September 2001, Christopher subjected D.K., also a minor, to sexual penetration without D.K.'s consent.

An affidavit of probable cause filed by the Gering Police Department stated that both M.A. and D.K. indicated to officers that Christopher had inserted his finger into their rectums. One of the minors also stated that Christopher had held him down by force on a bed and forced his penis into the minor's rectum, ejaculating onto his buttocks. The affidavit further stated that there was a potential third victim, who had not yet been interviewed at the time the affidavit was made.

Also on May 3, 2002, the juvenile court adjudicated Christopher as a minor within the meaning of Neb. Rev. Stat. § 43-247(2) and (3)(b) (Cum. Supp. 2002) upon Christopher's admission of the allegations against him.

On August 28, 2002, a dispositional hearing was held and the court placed Christopher in the care, custody, and control of OJS for direct supervision and further placement. Christopher was then placed at LRC for sexual offender treatment. In November 2003, Christopher moved to a treatment group home called the Whitehall Sex Offender Program (Whitehall) at LRC.

On April 29, 2004, a psychiatrist and a licensed mental health provider with Whitehall jointly wrote a letter to the juvenile court on behalf of the treatment team at Whitehall. In that letter, they stated that Christopher had moved to Whitehall in November 2003 and had sexually assaulted two same-age male peers and one 10-year-old female. The letter also stated that while in treatment, Christopher disclosed that he had assaulted two male cousins, ages 2 and 6, and a female cousin, age 12. The letter indicated that Christopher's sexual contact had included forced sexual touching, forced masturbation, and forced vaginal and anal penetration.

The letter also stated that Christopher was currently attending school at LRC given that after beginning public school on August 23, 2003, he was expelled in January 2004 at the public school's request due to alleged gang activity and the fact that Christopher had sexually touched or harassed a female student. As to current progress, the letter stated that Christopher had displayed deviant and manipulative behaviors in the last few weeks before the letter was written, having brought his girl friend onto campus, trying to pass her off as a relative, and having made plans with two other juveniles to run away from school.

The letter stated that Christopher's primary problem was adjustment disorder with mixed disturbance of emotions and conduct, which placed Christopher at high risk for future law violations. The letter noted that Christopher's sexual offending behaviors appeared to be secondary at that time. The treatment team recommended the following for Christopher: a 24-hour supervised residential facility to provide safety and security for Christopher, continued social or coping skills programming and cognitive restructuring, continued psychiatric care, and continued court supervision.

On June 2, 2004, the juvenile court held a hearing on Christopher's continued placement at Whitehall. Bridget Trebilcock, an integrated care coordination service worker with the Nebraska Department of Health and Human Services (DHHS), testified that she had been Christopher's caseworker for the preceding year. Trebilcock testified that she had recently learned that LRC was concerned about Christopher's growing conduct disorder behaviors. Trebilcock stated that Christopher

had yet to successfully complete the sexual offender program at LRC and that LRC was asking that Christopher be discharged from Whitehall and placed in an enhanced treatment group home, one step above Whitehall in the restrictiveness of its environment. Trebilcock stated that there were several such homes in Nebraska, including one in Lincoln. Trebilcock stated that Christopher wished to stay in Lincoln to be near his girl friend and had threatened to cause as much trouble as he could, including breaking the law, in order to remain in Lincoln.

Trebilcock stated that she had prepared a case plan and court report dated May 26, 2004, and that document was entered into evidence. In the report, Trebilcock stated that since moving to Whitehall, Christopher had made little progress, struggling with the accountability that comes with fewer restrictions at the group-home level of care. Trebilcock stated that while at Whitehall, Christopher "struggled with appropriate boundaries, feeding into negative behaviors of others, staying on task, and manipulating [Whitehall] staff."

Trebilcock stated that recently, Christopher had become even more noncompliant with the rules and restrictions at Whitehall and had threatened to kill, stab, or choke other juveniles at the group home. Trebilcock stated that in Whitehall's opinion, Christopher was not ready to be back in the community and needed further treatment at another facility to ensure his own safety, as well as that of the community.

Christopher's mother testified at the June 2, 2004, hearing and stated that she wanted Christopher to come home. She testified that she had arranged for Christopher to see two mental health providers for his conduct disorder, his attention deficit disorder, and his sexual offenses. Regarding supervision, she testified that both she and her husband, Christopher's father, worked outside of the home and that she hoped that Christopher could get a job for the summer wherein he would be supervised by people having knowledge of his past offenses. She testified that she and Christopher's father had two other children—a son who was 11 at the time of the hearing and a daughter who was 6. Christopher's mother stated that some of Christopher's sexual assault victims were his cousins who still lived in the area.

At the end of the hearing, the juvenile court stated that it was agreeable to the idea of Christopher's coming home, because his treatment at LRC had been unsuccessful so far and because, in the court's view, Christopher may not do any better at an enhanced treatment group home. The court noted, though, that it would not agree to Christopher's going home on a trial basis unless Christopher had full-time adult supervision. The court asked Christopher's parents to look into supervision options. The court stated that if full-time supervision could not be found for Christopher, Christopher would be placed in an enhanced treatment group home. The court set out its findings in an order filed August 19, 2004, in which the court stated that Christopher was to be placed back with his parents, the placement being effective as of July 30, 2004.

On July 23, 2004, another hearing was held. At that hearing, Trebilcock testified that DHHS searched the state for an enhanced treatment group home for Christopher, but that all such placements were denied because Christopher had not successfully completed Whitehall's sexual offender program. Trebilcock stated that DHHS had found a residential treatment center to treat Christopher in South Sioux City, Nebraska. Trebilcock stated that Christopher would be able to enter the treatment center in 30 to 60 days and would be treated for both his conduct disorder and his sexual offending behaviors. Until that time, she testified, LRC would maintain Christopher's placement at LRC in order to keep Christopher and the community safe. Trebilcock testified that it was not safe to return Christopher to his home at that time because although Christopher had been educated regarding his sexual offenses, Christopher was unable to apply this education because of his conduct disorder.

Trebilcock testified that Christopher's tendency to minimize his behaviors had contributed to his inability to complete the program at Whitehall and that Christopher's family had not supported Christopher in helping him control his behaviors. Specifically, Trebilcock stated that over the last several months before the July 23, 2004, hearing, Christopher's family had stopped contact with DHHS on occasion. Trebilcock also stated that Christopher's father had remarked that Christopher should come home and that Christopher relied on his father's statement,

asserting that he did not have to participate in the Whitehall program any more because his father wanted him to come home.

Trebilcock also testified that Christopher continued to sexually violate others while placed at Whitehall. In addition to touching the inner thigh of a girl at public school, which in part led to Christopher's expulsion, Christopher had recently groped another male during a basketball game at LRC. Trebilcock also noted that Christopher had sexually assaulted both boys and girls and that these children varied widely in terms of their age.

After hearing all of the evidence, the juvenile court stated that even though Christopher was at high risk to reoffend, it would not be fair to Christopher to keep him in an out-of-home placement or in an institutional setting. The court stated that he would allow Christopher to go home, but that Christopher's parents had to come up with a plan providing an adequate amount of adult supervision for Christopher. The court ordered that Christopher be placed in detention and that within a week, OJS was to prepare and file a safety plan outlining conditions under which Christopher and the community would be reasonably safe while Christopher lived at home. The court memorialized its findings in a journal entry filed August 23, 2004, stating that allowing Christopher to come home "is not an unacceptable risk provided proper parental supervision."

Within the required time period, OJS filed its safety plan, stating that OJS was not waiving its objection to Christopher's returning home. The safety plan laid out by OJS recommended the following in the event that Christopher did return home: that Christopher's victims and their families be notified of Christopher's return, given that two of Christopher's victims live near his family home and that other victims were family members; that Christopher and his family participate in intense individual and family therapy; that Christopher follow all conditions of liberty for his "parole"; and that Christopher be supervised and follow the safety plan.

In late July 2004, after the July 23 hearing, OJS had stated in a brief to the juvenile court that it objected to any ruling by the court allowing Christopher to return home because Christopher presented an unreasonable risk of harm to others, both in his parents' home and in the community at large. OJS stated that

although it had set out a safety plan as ordered by the court, in its opinion, the risk of harm could not be alleviated by a safety plan that did not require therapeutic success prior to Christopher's placement with his parents. For these reasons, OJS requested the court to enter an order discharging Christopher from OJS' custody.

Also in late July 2004, after the July 23 hearing, the trial judge had called Whitehall officials and told them that Christopher was to be released to his parents' care, and Christopher was then placed with his parents. On August 19, the court conducted a further hearing on the court-ordered safety plan, OJS' objections, and OJS' request to discharge Christopher. At the hearing, Trebilcock testified that Christopher's aunt was supervising Christopher when Christopher's parents could not do so. Trebilcock stated that Christopher had started football practice the preceding week and that Christopher's parents had arranged for a family friend to watch Christopher at practice.

Trebilcock stated that Christopher would drive back and forth from school on his own and that the school needed to be notified of Christopher's past problems so that he could be adequately supervised there. Trebilcock stated that Christopher was receiving outpatient sexual offender treatment and was also seeing a professional for attention deficit hyperactivity disorder and conduct disorder. Trebilcock stated that Christopher's placement with his parents was contrary to OJS' recommendations and that OJS could not adequately provide services to Christopher and his parents under the circumstances.

Christopher's father also testified. He stated that he and Christopher's mother had yet to tell Christopher's school about Christopher's sexual offender issues and that the family friend who was responsible for watching Christopher during football practice was also unaware of Christopher's background. Christopher's father stated that he was unsure that the family friend should be made aware of Christopher's past.

In a journal entry filed September 3, 2004, the court overruled OJS' objections and ordered that Christopher be placed in his parents' home under OJS' supervision. The court ordered that OJS' safety plan be implemented and ordered Christopher's parents to comply with the safety plan. The court also denied OJS'

request to discharge Christopher and asked OJS to provide transitional services. OJS appeals.

## ASSIGNMENTS OF ERROR

On appeal, OJS contends that the court erred in (1) denying OJS' request for a higher level of treatment for Christopher, (2) ordering OJS to develop a safety plan and submit it to the court for approval, (3) ordering that Christopher be released from detention to his parents while yet in the custody of OJS and without prior notice and opportunity for OJS to be heard, (4) ordering that Christopher be placed in his parents' home during his continued custody in OJS and over OJS' objection, (5) ordering OJS to implement the safety plan and to supervise Christopher in the parental home, and (6) denying OJS' request that the court discharge Christopher from OJS' custody if Christopher were ordered returned to his parents' home.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005).

## ANALYSIS

On appeal, OJS contends that the court erred in denying its request for a higher level of treatment for Christopher.

Neb. Rev. Stat. § 43-408(4) (Reissue 2004) involves requests by OJS to transfer a juvenile to a higher level of care and states in part:

> For transfer hearings, the burden of proof to justify the transfer is on [OJS], the standard of proof is clear and convincing evidence, and the strict rules of evidence do not apply. Transfers of juveniles from one place of treatment to another are subject to section 43-251.01 and to the following:
>
> (a) Except as provided in subdivision (b) of this subsection, if [OJS] proposes to transfer the juvenile from a

less restrictive to a more restrictive place of treatment, a plan outlining the proposed change and the reasons for the proposed change shall be presented to the court which committed the juvenile. Such change shall occur only after a hearing and a finding by the committing court that the change is in the best interests of the juvenile, with due consideration being given by the court to public safety. At the hearing, the juvenile has the right to be represented by counsel.

In the instant case, OJS filed a request to transfer Christopher to a more restrictive setting. At subsequent hearings, OJS presented evidence to show that Christopher's transfer to a more restrictive facility was in Christopher's best interests and that returning Christopher home without successful completion of a treatment program was a threat to the public's safety.

■ Initially, we note that Christopher disagrees that OJS was requesting a transfer to a more restrictive setting for him, citing some testimony by Trebilcock suggesting that the transfer would be to a treatment setting with similar restrictions. Our review of the record shows that there was conflicting evidence on this issue and that the juvenile court determined that OJS was seeking to transfer Christopher to a more restrictive facility. We will not overturn the juvenile court's finding in that regard. When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Heather R. et al., supra.*

The record shows that in November 2003, Christopher moved to Whitehall, and that he had sexually assaulted two same-age male peers and one 10-year-old female. While in treatment, Christopher disclosed that he had assaulted two male cousins, ages 2 and 6, and a female cousin, age 12. Christopher's sexual contact had included forced sexual touching, forced masturbation, and forced vaginal and anal penetration.

Although Christopher began attending public school on August 23, 2003, he was expelled in January 2004 at the school's request due to his alleged gang activity and sexually touching or harassing a female student. The record also shows that LRC intended to discharge Christopher from the Whitehall

program given Christopher's increasing display of deviant and manipulative behaviors including threats to kill, stab, or choke other juveniles at the group home. Trebilcock stated that in Whitehall's opinion, Christopher was not ready to be back in the community and needed further treatment at another facility to ensure his own safety, as well as that of the community.

The record shows that the treatment team originally diagnosed Christopher with an adjustment disorder with mixed disturbance of emotions and conduct, in addition to his sexual offending and attention deficit disorder. Subsequently, Christopher was diagnosed with adolescent-onset conduct disorder, which placed Christopher at high risk for future law violations. The treatment team recommended the following for Christopher: a 24-hour supervised residential facility to provide safety and security for Christopher, continued social or coping skills programming and cognitive restructuring, continued psychiatric care, and continued court supervision.

Trebilcock testified that it was not safe to return Christopher to his parents' home because although Christopher had been educated regarding his sexual behaviors, Christopher was unable to apply this education because of his conduct disorder. Trebilcock also testified that Christopher's tendency to minimize his behaviors had contributed to his inability to complete the program at Whitehall and that Christopher's family had not supported Christopher in helping him control his behaviors.

Additionally, Trebilcock stated that Christopher asserted that he did not wish to go back and live with his parents and that he wanted to stay in Lincoln to be near his girl friend, even if that meant going into foster care. Trebilcock also stated that Christopher had threatened to cause as much trouble as he could, including breaking the law, in order to be able to remain in Lincoln.

Trebilcock testified that Christopher continued to sexually violate others while placed at Whitehall. In addition to touching the inner thigh of a girl at public school, which in part led to Christopher's expulsion, Christopher had recently groped another male during a basketball game at LRC. Trebilcock also noted that Christopher had sexually assaulted both boys and girls and that these children varied widely in terms of their age. Most

important, Trebilcock stated that Christopher had never success-fully completed treatment for his sexual offenses at Whitehall.

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). After reviewing the record de novo, we conclude that the juvenile court erred in denying OJS' request to transfer Christopher to a facility with increased restrictions. The evidence on this record illustrates that OJS met its burden to show, by clear and convincing evidence, that such a move was in Christopher's best interests and that the public would remain safe if Christopher were transferred.

Although the juvenile court acknowledged that Christopher was at high risk to reoffend, the court stated that it was not fair to Christopher to send him to another treatment facility rather than send him home. We note, though, that § 43-408 speaks not of fairness but of whether such a change "is in the best interests of the juvenile, with due consideration being given by the court to public safety."

The record shows that despite 2 years of treatment at Whitehall, Christopher failed to successfully complete his treat-ment, continued to engage in sexually violative behavior, and remained a threat to other people's safety. The record clearly shows that Christopher is in need of further treatment and that sending Christopher home to live with his parents is not in Christopher's best interests; additionally, placement with his parents does not take into consideration the public's safety.

## CONCLUSION

After reviewing the record de novo, we conclude that the juvenile court erred in releasing Christopher to live with his par-ents. Therefore, the juvenile court's order is reversed, and we remand the cause to the court with directions to adopt OJS' case plan and court report recommending Christopher's transfer to a more restrictive facility. Because of this resolution, we do not address OJS' other assignments of error. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

REVERSED AND REMANDED WITH DIRECTIONS.