IN RE INTEREST OF EDEN K. AND ALLISON L.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
V. KELLI G., APPELLANT.
717 N.W.2d 507

Filed July 3, 2006.    No. A-05-1567.

Paula J. Fritz for appellant.

Stuart J. Dornan, Douglas County Attorney, Chad M. Brown, and April Franklin, Senior Certified Law Student, for appellee.

INBODY, Chief Judge, and IRWIN and CARLSON, Judges.

INBODY, Chief Judge.

## I. INTRODUCTION

Kelli G. appeals from the order of the separate juvenile court of Douglas County, Nebraska, terminating her parental rights to Eden K. and Allison L. and overruling her motion for continued visitation. For the reasons set forth herein, we reverse the judgment of the juvenile court and remand for further proceedings consistent with this opinion.

## II. STATEMENT OF FACTS

On April 22, 2004, the State filed a petition alleging that Eden and Allison came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002), in that they lacked proper parental care by reason of the faults or habits of Kelli. Specifically, the State alleged that Kelli's "use of alcohol and/or controlled substances" placed the children at risk for harm; that Kelli had engaged in domestic violence with her boyfriend in Eden and Allison's presence; that Kelli had failed to provide safe, stable, and independent housing for the children; and that Kelli was incarcerated. On July 6, the juvenile court found that Eden and Allison were children within the meaning of § 43-247(3)(a).

On August 9, 2005, the State filed a motion for termination of Kelli's parental rights with regard to Eden and Allison. The State contended that Kelli "was ordered to comply with various plans of rehabilitation by the Separate Juvenile Court of Douglas County, Nebraska, to-wit: August 9, 2004; December 6, 2004 and April 22, 2005." The State alleged that Eden and Allison came within the meaning of Neb. Rev. Stat. § 43-292(2) (Reissue 2004) because Kelli had substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection; § 43-292(4) because Kelli was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to the health, morals, or well-being of the children; and § 43-292(7) in that Eden and Allison had been in an out-of-home placement for 15 or more months of the most recent 22 months. The State further alleged that terminating Kelli's parental rights was in the best interests of Eden and Allison.

On October 6, 2005, Kelli filed a motion to continue visitation. In her motion, Kelli asked to continue to participate in supervised visits with Eden and Allison even if her parental rights were terminated. She alleged that "a disruption or suspension of visitation would be detrimental to the parent-child bond that currently exists between" herself and Eden and Allison and that allowing her to continue visitation would be in the girls' best interests.

Proceedings were had on the State's motion to terminate Kelli's parental rights beginning on October 11, 2005. The State first called Roxanne Jackson to testify on its behalf. Jackson testified that she worked for the Nebraska Department of Health and Human Services (DHHS) and that she became the ongoing case manager for Eden and Allison in May 2004. Jackson testified that at the time she became involved in the case, Kelli was incarcerated for check forgery and drug charges. Jackson said that she met with Kelli shortly after taking on the case and that they "agreed that [Kelli] needed chemical dependency treatment, she would need to address domestic violence issues, and [she would] work on some of the issues that she had from her childhood." Jackson said that she authored a court report on August 6

and that Kelli was no longer incarcerated at that time. Jackson said that Kelli had not made any progress toward reunification with Eden and Allison between May and August; that "Kelli was very, very focussed on her relationship with [Allison's biological father]"; and that it was "very difficult for [Kelli] to focus on anything else at that particular time." Specifically, Jackson said that Kelli "did not comply with following through with getting urinalysis testing done."

Jackson testified that she authored another court report on December 2, 2004. Jackson said that Kelli had completed a chemical dependency evaluation and a psychological parenting assessment at that time, but that "[t]here were some issues with getting Kelli into a treatment facility" due to "an extensive waiting list with most of the providers in Omaha." Jackson testified that Kelli had another child, Madison L., with Allison's biological father and that "Madison was placed into protective custody shortly after her birth due to testing positive for methamphetamine at birth . . . in August of 2004." She also said that she still had concerns about Kelli's drug use, in that it may have continued since August 2004.

Jackson prepared another court report on February 11, 2005. Jackson testified that in February, Kelli was incarcerated at the women's correctional center in York, Nebraska, due to "violating the conditions of her probation in District Court." Between February and June, Jackson said, she was not able to offer services to Kelli due to her incarceration. Jackson testified that during her work on the case, Kelli never provided her with proof that she had a legal source of income or a home for herself or the children. Jackson said that she was concerned about Kelli's use of methamphetamine because the drug "impairs a parent's ability to [provide] proper parenting." Jackson testified that "Allison also was exposed to drugs during Kelli's pregnancy, so you see a pattern develop and that is concerning." Jackson said that from May 2004 until the time of trial, neither Eden nor Allison had been returned to Kelli's care.

Jackson testified that "[b]ased solely on [Kelli's] circumstances of being incarcerated for the length of time she's going to be incarcerated, [Kelli is] not in a better position to parent . . . Eden and Allison" than she was in May 2004. Jackson testified

that she was also taking into account "the fact that Allison had drugs in her system, as well as Madison in 2004." She said that she "believe[d] it's a pattern of behaviors, and Kelli has struggled and not been able to maintain abstinence from drugs." She testified that in her opinion, it was in Eden's and Allison's best interests to terminate Kelli's parental rights based on "[t]he length of time that the children have already been in care, [Kelli's] history, and the amount of time she's going to be incarcerated." Jackson testified that Kelli would be eligible for parole "some time late in 2007." Jackson testified that the children needed permanency and that Kelli could not provide them with permanency due to "[h]er current circumstances [of] being incarcerated." Jackson said that she was no longer Eden and Allison's caseworker, having ended her connection with the case in June 2005.

On cross-examination by the guardian ad litem for Eden and Allison, Jackson said that at the time of a December 2004 review hearing, Kelli had not submitted to random urine tests as ordered and had not entered treatment as required by her evaluation. On cross-examination by Kelli's attorney, Jackson testified that prior to August 6, Kelli had not been ordered to enter chemical dependency treatment, complete a domestic violence class, or do any individual therapy. Jackson conceded that Kelli completed a chemical dependency evaluation on June 30 and that Kelli submitted to urinalysis testing on July 12 and 20. She also conceded that prior to becoming incarcerated in York, Kelli "was in an inpatient treatment facility." Jackson also admitted that she had not arranged for Kelli to enter chemical dependency treatment. Jackson also testified that while Kelli was in York, Kelli had participated in chemical dependency treatment. Jackson further conceded that at the disposition hearing of December 3, the court ordered supervised visitation for Kelli, but that visitation was not arranged and that Jackson did not arrange visitation between Kelli and the children when Kelli went to York.

Jackson testified that she could not recall whether she had requested that Kelli submit to urinalysis testing after December 2, 2004, or how many times she had met with Eden or Allison. Jackson said that she had never attended a visit between the girls

and Kelli. Jackson testified that Kelli was eligible for parole on April 13, 2007. Jackson said that she did not have any current information regarding Kelli's chemical dependency and that she was unaware whether Kelli had completed chemical dependency treatment in York. She did say that visitation had been arranged after Kelli had been incarcerated and that Kelli had not received any services regarding reunification after her incarceration.

On redirect examination, Jackson said that there were concerns regarding Kelli's July 20, 2004, urinalysis, as the laboratory "would not test [Kelli's sample] because it was out of the normal temperature range, which [the laboratory] say[s] indicates tampering." She also testified that she was unaware of Kelli's whereabouts during a period in November and December 2004. She said that Kelli has convictions for possession of marijuana, possession of drug paraphernalia, and possession of a controlled substance. Jackson said that Kelli had been ordered by the court on August 9 to enter a chemical dependency treatment facility, but that she did not enter until December.

The State also called Susan Larson to testify on its behalf. Larson testified that she was a protection and safety worker for DHHS, that Eden and Allison's case was transferred to her on June 2, 2005, and that she had been assigned to the case since that date. Larson testified that Kelli had not provided her with proof that she had either a legal source of income or a safe, stable home for Eden and Allison "because she's been incarcerated." Larson said that if Kelli "continued to use [drugs,] then she would not be able to properly parent." Larson further testified that in her opinion, it would be in Eden's and Allison's best interests to terminate Kelli's parental rights based "[o]n the fact that the children have been in out-of-home care for over 15 months and they need a sense of permanency in their lives." She explained, "They need to have stable homes and a place where they don't have to feel like they are being tossed around." When asked what services she had provided to Kelli, Larson testified, "Currently, she's receiving supervised visitation. The maximum she's allowed to have is one time per month due to the programs that she's in. She is involved in programs at York to deal with her drug usage." Larson said that Kelli's being incarcerated "hinder[s] some of the serviceability of [DHHS] to offer."

On cross-examination by Kelli's attorney, Larson acknowledged that the current court orders for Kelli were to "take advantage of the rehabilitative services for her drug addiction, and for parenting skills as available with her incarceration; [and] that she have reasonable rights of supervised visitation." Larson conceded that Kelli was in compliance with all of the current court orders and that it would not be possible for Kelli to have an independent source of income or a residence due to her incarceration. Larson also conceded that Kelli was in a substance abuse unit in York and that she "attends classes daily, at least several times a week." Larson explained, "It's a very strict program [wherein] she has to comply with the attendance or she risks being kicked out of the program, and . . . they also do [urinalysis tests] randomly." Larson testified that Kelli was in good standing in that program and that her participation in the program was voluntary. Larson said that she had never observed any visits between Kelli, Eden, and Allison, but that she had "had positive reports from visitation" and that there "haven't been any concerns brought to [her] attention."

The trial was continued on November 28, 2005. Larson testified that Eden and Allison's foster parents as of that date were Kelli's brother and his wife. Kelli's visitation with Eden and Allison was described by Larson as "very good for them, a positive experience." Larson also testified that Kelli, Eden, and Allison had telephone contact; that Kelli had sent letters to Eden and Allison; and that the letters were appropriate. Larson also testified that Kelli had sent gifts to the girls. When asked whether Kelli "has made . . . every effort to stay in contact with her girls, even though she is incarcerated," Larson replied that she had. Larson said that Eden and Allison "look forward to seeing [Kelli] when [visits] are scheduled." Larson testified that Kelli was doing all that she could regarding reunification with Eden and Allison, given her incarceration, and that Kelli was in compliance with all court orders regarding reunification. Larson said that Kelli was actively taking steps toward reunification and that Kelli had not shown "any indication that she is unwilling to do what needs to be done to be reunified with Eden and Allison."

Larson also testified with regard to Kelli's motion for continued visitation in the event her parental rights were terminated.

Larson testified that "everyone basically agreed that since the children would be with family, contact would still be there in some form, regardless of termination or not." Larson further testified:

> I think that they should have visitation, you know, if that's going to be a continued family placement and [Kelli is] going to have contact, but I think it should be with the therapist's recommendations. I mean, if the termination does go through or not, we need to incorporate whatever's in [the children's] best interest for seeing their mom.

At the conclusion of Larson's testimony, the State offered an exhibit and then rested. Kelli made a motion to dismiss, which was overruled; Kelli then rested. After arguments were had, the court took the matter under advisement.

On November 30, 2005, the juvenile court filed its order terminating Kelli's parental rights to Eden and Allison. In its order, the court found, "[T]he State's witnesses were credible and their testimony was probative and reliable, and the exhibits received into evidence were also credible, probative and reliable." The court further found:

> Eden and Allison have been in foster care since approximately April 22, 2004 and have never been returned to their mother due to lack of compliance with the rehabilitative case plan, her failure to correct the issues [that] placed the children into the jurisdiction of the Court and into protective custody, as well as [Kelli's] failure to make meaningful therapeutic progress, and due to [Kelli's] second incarceration, which resulted from her actions, [that] prevents her from providing proper parental care for her children and because she will not be eligible for possible parole until some time in 2007. The children have languished in foster care and deserve permanency. In addition, Madison[, Eden and Allison's younger sister,] tested positive for methamphetamine at birth.

The court held that the State had proved by clear and convincing evidence that Eden and Allison were within the meaning of § 43-292(2), (4), and (7) and held that terminating Kelli's parental rights was in Eden's and Allison's best interests.

The court also overruled Kelli's motion to continue visitation. The court noted that it was denying the motion

based on the testimony of . . . Larson, where she stated that [DHHS] would need an opinion from a therapist regarding the best interests of the children as to further contact with the mother, and it would be dependent upon the foster/adoptive placement of the children, all of which shows the Court that there is no evidence of a meaningful and significant relationship between [Kelli] and [Eden and Allison], nor that it is in the best interests of the children to have such visitation.

Kelli has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Kelli alleges, restated, that the juvenile court erred when it terminated her parental rights, when it refused to allow testimony regarding alternatives to terminating Kelli's parental rights, and when it denied her motion to continue visitation.

## IV. STANDARD OF REVIEW

■ Cases arising under the Nebraska Juvenile Code, and specifically an appeal from an order terminating parental rights, shall be reviewed de novo on the record, and an appellate court must reach conclusions independent of the trial court's findings while disregarding impermissible or improper evidence. *In re Interest of Kindra S., ante* p. 202, 705 N.W.2d 792 (2005).

■ Clear and convincing evidence means the amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved and, further, that it is more than a preponderance of evidence, but less than proof beyond a reasonable doubt. *Id.*

## V. ANALYSIS

### 1. Termination of Parental Rights

#### (a) Statutory Basis

Kelli first alleges that the juvenile court erred when it found that the State had proved, by clear and convincing evidence, that her parental rights should be terminated. In the instant case, the State sought to terminate Kelli's parental rights under § 43-292(2), (4), and (7). Section 43-292 provides the following, in relevant part:

The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

. . . .

(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection;

. . . .

(4) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile;

. . . .

(7) The juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months.

The juvenile court held that the State had proved that Eden and Allison were within the meaning of each of the aforementioned statutory grounds and held that terminating Kelli's parental rights was in Eden's and Allison's best interests.

■ If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). It is clear from the record that Eden and Allison were placed in the temporary custody of DHHS pursuant to a juvenile court order on April 22, 2004, and that they had been in an out-of-home placement between that date and the August 9, 2005, filing of the motion to terminate Kelli's parental rights. As of the filing of the motion to terminate Kelli's parental rights, Eden and Allison had been in an out-of-home placement for nearly 16 consecutive months. The State proved this by clear and convincing evidence, and therefore, we need not further address the sufficiency of the evidence to support termination under either

§ 43-292(2) or (4), although we note that the evidence offered by the State to prove these statutory grounds will be relevant in considering whether or not terminating Kelli's parental rights is in Eden's and Allison's best interests.

### (b) Best Interests

Kelli also alleges that the juvenile court erred when it found that the State had proved, by clear and convincing evidence, that terminating her parental rights would be in Eden's and Allison's best interests.

It is well established that a juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). A parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one. *Id.* Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *Id.*

Kelli contends that the facts in the instant case strongly re-semble those seen in *In re Interest of Aaron D., supra.* In *In re Interest of Aaron D.*, the State sought to terminate a mother's parental rights solely on the basis of § 43-292(7), which was not the case here. However, an examination of the case is instructive. The Nebraska Supreme Court noted the following, with respect to the "best interests" analysis:

> We acknowledge that the record does not reflect that [the mother] has accomplished all of the goals set forth in her case plan. However, the record indicates she has progressed, and, as will be explained below, her "opportunities for compliance [with the case plan] may have been limited.". . . Most significant, however, is the failure of the State to produce the clear and convincing evidence required to show that termination would be in [the child's] best interests.
>
> As previously stated, the sole witness to testify for the State at trial was [the DHHS caseworker]. Obviously, [DHHS'] caseworker for a particular family is likely to be an important witness for all the parties. But here, the State

used [the caseworker] as a proxy for all of the other witnesses whose expertise and testimony would have been helpful, and perhaps essential, in determining what was in [the child's] best interests. [The caseworker's] testimony was based to some extent on her own observations, but in large measure on [the caseworker's] review of the records and reports generated by the family support workers, therapists, foster parents, and others who directly observed the parties.

In short, much of [the caseworker's] testimony—and thus, much of the State's case—was based on hearsay. While the Nebraska Evidence Rules do not apply in juvenile proceedings, the basic requirements of due process oblige a court to consider the type of evidence used by the State in order to determine the weight to be given to that evidence. . . . It is very difficult, with the record presented in this case, to give substantial weight to some of the key allegations made by [the caseworker].

(Citations omitted.) *In re Interest of Aaron D.*, 269 Neb. at 261-62, 691 N.W.2d at 173-74.

The Nebraska Supreme Court further determined that the State had not proved, by clear and convincing evidence, that terminating the mother's parental rights was in the child's best interests:

Because the primary consideration in determining whether to terminate parental rights is the best interests of the child, a juvenile court should have at its disposal the information necessary to make the determination regarding the minor child's best interests regardless of whether the information is in reference to a time period before or after the filing of the termination petition. . . . Yet, the juvenile court in this case, and this court for its de novo review, was not provided with such evidence. [The child's] therapists did not testify. [DHHS'] family support workers, who actually observed [the child] and [the mother], did not testify, nor did [the child's] foster parents, nor [the child's] teachers. The State seems to have forgotten that the focus of this proceeding is not [the mother], but [the child], and the State thus did not present evidence directly adduced from many of the people most able to testify as to [the child's]

condition, circumstances, and best interests, both before and after the filing of the termination petition. The standard for proving that termination of parental rights is in a juvenile's best interests is clear and convincing evidence, and the evidence in this record is, simply stated, neither clear nor convincing.

. . . .

We have stated that termination of parental rights is permissible " '[i]n the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . .' " . . . After our de novo review of the record, we do not find clear and convincing evidence that termination was in [the child's] best interests. "[T]he law does not require perfection of a parent. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.". . . Those things are present here.

(Citations omitted.) *In re Interest of Aaron D.*, 269 Neb. 249, 263-65, 691 N.W.2d 164, 175-76 (2005).

Kelli also suggests that the case at bar is factually similar to that seen in *In re Interest of Skye W. & McKenzie W., ante* p. 74, 704 N.W.2d 1 (2005). Again, in *In re Interest of Skye W. & McKenzie W.*, the State sought to terminate the mother's parental rights to her children solely on the basis of § 43-292(7). This court concluded that terminating the mother's parental rights was not in the children's best interests:

In the present case, the sole witness called by the State to prove the need for termination of parental rights was the assigned caseworker. The sum total of the State's evidence for terminating [the mother's] rights to parent these children consisted of approximately 43 pages of testimony and one exhibit. The caseworker, as a proxy for expert medical testimony, attempted to present testimony about [the mother's] mental health issues and opined that [the mother] needed individual therapy, proof that she was taking medications, and regular psychiatric checkups to deal with a diagnosis of suffering from bipolar disorder. The caseworker, however, acknowledged that she did not recall what

medications [the mother] was supposed to be taking and did not know if [the mother] still needed to be on medication.

In addition, the caseworker's testimony was based in large measure on information reported to her, rather than on her own personal observations. For example, the caseworker opined that the children would not be safe in [the mother's] care, based on [the mother's] diagnosis of bipolar disorder and on a review of visitation reports. The caseworker acknowledged, however, that there had never been any concerns about the children's safety during any visitation but that [the mother] had not made progress toward unsupervised visitation. The caseworker never made it clear why a lack of progress toward unsupervised visitation amounted to a concern for the safety of the children such that the children's best interests would be served by terminating [the mother's] parental rights.

. . . .

The State presented no evidence from a medical expert or therapist in this case—either for the children or for [the mother]—concerning [the mother's] diagnosis, medicinal needs, or ability to successfully parent the children. The State presented no evidence from any foster parent or education provider. The State essentially presented no evidence whatsoever concerning the children at issue in this case—their needs or their best interests.

*In re Interest of Skye W. & McKenzie W., ante* at 79-80, 704 N.W.2d at 5-6.

At trial, the only witnesses to testify were Jackson and Larson, two caseworkers who had been assigned to work with Eden, Allison, and Kelli. Jackson opined that terminating Kelli's parental rights would be in the children's best interests. Jackson testified that in her opinion, it was in Eden's and Allison's best interests to terminate Kelli's parental rights based on "[t]he length of time that the children have already been in care, [Kelli's] history, and the amount of time she's going to be incarcerated." Jackson testified that the children needed permanency and that Kelli could not provide them with permanency due to "[h]er current circumstances [of] being incarcerated." Larson said that she believed terminating Kelli's parental rights would serve the best

interests of Eden and Allison based "[o]n the fact that the children have been in out-of-home care for over 15 months and they need a sense of permanency in their lives." She explained, "They need to have stable homes and a place where they don't have to feel like they are being tossed around."

Both Jackson and Larson focused on the fact that Eden and Allison deserve permanency in their lives. It is well established that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006). However, in the instant case, there is no evidence that adoption is a possibility for Eden and Allison. Instead, as of November 14, 2005, the children were placed in the care of Kelli's brother and his wife. There is nothing in the record to suggest that terminating Kelli's parental rights would provide the children with any more permanency than they would have otherwise.

At trial, Jackson testified that she could not recall how many times she had met with Eden or Allison, and she said that she had never attended a visit between the girls and Kelli. Larson testified that Kelli was in compliance with all of the current court orders and that Kelli was in a substance abuse unit in York. Larson testified that Kelli "attends classes daily, at least several times a week." She explained, "It's a very strict program [wherein] she has to comply with the attendance or she risks being kicked out of the program, and . . . they also do [urinalysis tests] randomly." Larson testified that Kelli was in good standing in that program and that her participation in the program was voluntary. Larson said that she had never observed any visits between Kelli, Eden, and Allison, but that she had "had positive reports from visitation" and that there "haven't been any concerns brought to [her] attention."

Kelli's visitation with Eden and Allison was described by Larson as "very good for them, a positive experience." Larson also testified that Kelli, Eden, and Allison had telephone contact; that Kelli had sent letters to Eden and Allison; and that the letters were appropriate. Larson also testified that Kelli had sent gifts to the girls. When asked whether Kelli "has made . . . every effort to stay in contact with her girls, even though she is incarcerated," Larson replied that she had. Larson said that Eden and

Allison "look forward to seeing [Kelli] when [visits] are scheduled." Larson testified that Kelli was doing all that she could regarding reunification with Eden and Allison, given her incarceration, and that Kelli was in compliance with all court orders regarding reunification. Larson said that Kelli was actively taking steps toward reunification and that Kelli had not shown "any indication that she is unwilling to do what needs to be done to be reunified with Eden and Allison."

This is not to suggest that Kelli is a perfect, or even a good, parent. It is indisputable that she has made terrible decisions in the past, resulting in her current incarceration. She also gave birth to a daughter, Madison, who had methamphetamine in her system at the time. However, it is equally indisputable that Kelli has made some positive strides in her life. She has been participating in drug rehabilitation treatment, and she has also continued to have positive visits with Eden and Allison. Larson testified that Kelli was actively taking steps toward reunification and that she was complying with all requests and orders made of her. The law does not require perfection of a parent. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Skye W. & McKenzie W., ante* p. 74, 704 N.W.2d 1 (2005). Termination of parental rights is permissible in the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code. *Id.*

We find that the State failed to prove, by clear and convincing evidence, that terminating Kelli's parental rights would be in Eden's and Allison's best interests. In *In re Interest of Skye W. & McKenzie W.*, this court found, "The State almost completely failed to provide the juvenile court, and by extension this court, with testimony from many of the people whose opinions and observations would have been most pertinent to the principal issue—the children's best interests." *Ante* at 82, 704 N.W.2d at 7. Similarly, in the instant case, the State presented no testimony from Eden and Allison's therapists or foster parents; in fact, the State essentially presented no evidence whatsoever concerning the needs or interests of either Eden or Allison. Our de novo review of the record suggests that Kelli has made improvements

in her parenting skills, and it appears that her relationship with Eden and Allison is beneficial. While it is true that she will be incarcerated until at least April 2007, there is no evidence in the record that the children are candidates for adoption or that terminating Kelli's parental rights would provide Eden and Allison with any additional permanency. Accordingly, we conclude that the juvenile court erred in finding that the State established, by clear and convincing evidence, that termination of Kelli's parental rights is in the children's best interests. The judgment of the juvenile court is reversed.

### 2. ADDITIONAL ASSIGNMENTS OF ERROR

Kelli also alleged that the juvenile court erred when it refused to allow evidence regarding alternatives to terminating her parental rights and when it overruled her motion for continued visitation should her parental rights be terminated. However, having determined that the juvenile court erred when it terminated Kelli's parental rights, we need not address Kelli's additional assignments of error. See *In re Interest of Christopher R.*, 13 Neb. App. 748, 700 N.W.2d 668 (2005) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

### VI. CONCLUSION

We find that the juvenile court erred when it found that the State had proved, by clear and convincing evidence, that terminating Kelli's parental rights would be in Eden's and Allison's best interests. Accordingly, we reverse the judgment of the juvenile court, and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.